My name is Deanne Maynard, and I represent Plaintiff's Appellants, Rearden Companies. And I would like to reserve three minutes of time for this. You may do so, Counsel. Just watch the clock. Thank you, Your Honor. May it please the Court. This Court repeatedly has emphasized that summary judgment should be rarely granted in trademark disputes, given the inherently factual nature of the dispute. This is not such a rare case. The record evidence amply demonstrates disputes of fact on both Rearden's trademark claims and its anti-cyberspotting claims. The district court made errors of law and decided facts that should be left to a jury. I'd like to start with the likelihood of confusion issue first. The district court correctly concluded that the mark here is fairly strong and that the marks are very similar. Here the marks, the names are similar. Insofar as they've used graphics, they're quite dissimilar. Well, but the marks aren't limited to the graphics, Your Honor. The mark that we claim here is the use of the word Rearden in the context of a technology company in the Bay Area of San Francisco. So we have reused Rearden. That's a name, a trade name and a trademark, consistently since 1999 in the service of, in the provision of technology services. Rearden Commerce is also a technology services company located within miles of a Rearden company. Both are business-to-business companies. They both sell their services to businesses, not to regular consumers. They both are. And the owners have a great interest in Atlas Shrugged, it appears. The evidence would so reflect, Your Honor. But the both are marketing themselves to the same investors. They're marketing themselves to the same type of companies. They're in the same field in Silicon Valley. The evidence is really strong that there has been actual confusion here. Well, it's sort of absurd to suggest that investors and medias and other persons actually or potentially in the market for party goods or services should be considered consumers when they never bought anything. Well, two points about that, Your Honor. This Court's case law is clear that it's not just consumers for in the inquiry of whether or not. It's not so clear, and that seems to me to be the interesting legal issue in the case. I'm sorry, Your Honor, I missed your question. I'm sorry? I missed what you said. I was just, it was a predecessor to a question. The question, the observation was it's not so clear. I mean, most of the time when we talk about this, we're talking about consumer conclusion. How could someone who never bought anything be a consumer? Well, I can, I would like to address. Please do. Yes. So the law in this Court does look to consumer confusion. In Survivor, this Court said that you do look beyond actual purchases. Well, that's beyond. But what if there is no consumer confusion because there's no consumer? Okay. And that goes to both the judges' questions. And that's my second point, which is here, what the district court fundamentally misunderstood is who the consumers are. And the consumers for these businesses are not people like you and me. The consumers, these are business-to-business consumers. My client, Riordan, and the Riordan companies are incubators for start-up companies. Their consumers are investors. Well, in fact, there seems to me that Riordan Commerce does seem to have ordinary consumers. They're business people, but they're consumers, i.e., people to whom they're selling their services. Right. Your client seems to have, its main business seems to be starting companies for its owners, which it then spins off. And there's a little bit of other stuff, the movie business. But mostly, it's getting investors for its own purposes, its own company. Well, there are no, I don't think that's what the record reflects, Your Honor. Or at least I think there's a disputed fact on, you know, what, how broad the business would cover. But as for the start-up piece, the record evidence would show that not only did the Riordan, did, has Riordan start up, started up companies and spun them off, but indeed selling the company to another, to investors, is itself the good that they are selling. So in Mr. Perlman's declaration, he says that that they do then sometimes, as you say, spin off the companies. But that is a sale in the business in which they are in. But as to that, is there any evidence of confusion? Is there any evidence that anybody was actually investing, i.e., if that's the product, was confused about whether this was the company that provides personal travel services to businesses or whether it was Steve Perlman's business? Yes, Your Honor. Both investors. In fact, some of their, the Riordan companies. Well, there was some evidence that some people at the Web 2.0 conference were confused. But how about the people who are actually making money? They think they're investing in the other company or they're going to invest in the other company instead. Is there any evidence of that? Well, one point, as a legal matter, initial consumer confusion is enough in this circuit. You don't have to actually purchase something. Well, there's no opinion on that, which limits it to a certain degree, but, i.e., that there has to be not just diversion, but some actual confusion. Well, but there has been actual confusion. Brookfield is the case that, on that actual confusion point. But initial consumer confusion can be enough in the analysis. But here there is evidence that McQuarrie, an actual investor in our clients, was confused and did mistake the two. And they aren't just, Riordan Commerce is not just a travel services company. They're a technology infrastructure company. They sell a technology infrastructure that then big companies like. They sell to I.T. departments. So their companies, their customers are companies' I.T. departments, not their travel departments, not their human resources departments. So those are very similar. And then back to your broader question, my client's services are varied and broad. The record evidence shows that they've done a wide variety of things, including selling motion picture services to motion picture companies, which is the same type of services and does overlap with the same product market that they have. We sell to, there's evidence in the record, we sold to Disney, sold to video game companies. These are the same types of big companies that they're also trying to sell their technology infrastructure to. And, as you say, there's evidence of confusion among sophisticated people in the tech sector. These people, there are two articles, one in PC Forum after a trade show that said Rearden Commerce presented at a show, but the main question in the conference hallways was whether the company had any relationship to Rearden Steel, the set-top box outfit started years ago by Web TV founder Steve Perlman. And the evidence in the record will show that their customers have sent emails to our email server at rearden.com thinking they were sending their emails to them, including complaints about their service. And so my client has a very legitimate concern that is supposed to be protected by the trademark laws, that his goodwill and reputation is being sullied by their use of a name that's extremely similar to his. Kagan. What you have is sort of a dilution claim, but you can't actually make out the elements of a dilution claim, i.e., it's not really that these are competitors or that people are buying our or who are buying Rearden Commerce's products think they're getting products from Steve Perlman's company or vice versa. It's more that you're afraid of some sort of tarnishment of your mark, but that isn't really the claim you've drawn. But likelihood of confusion doesn't one, it doesn't have to be confusion. You don't have to be competitors to show likelihood of confusion for, you know, trademark infringement. And it's enough that people will just associate you together. That's survivor again. And, indeed, this Court has held that survivor is both those points. And it's not you don't have to be actually, as this Court said in Brookfield, don't have to be, have the same prime directive. Your companies just have to be in overlapping fields. And here these companies are both targeting the Silicon Valley tech sector. They're within miles of one another, and there's been, there's ample evidence of actual confusion, in that we may not win if we get a trial, Your Honor. But that's enough under this circuit's precedent to entitle us to a trial to let the jury decide. So, Your Honor, we've had a lot of confusion in this case, and I think that's a very important point. Which leak grant factors favor you heavily or moderately? The similarity? They're very similar, yes. Very similar. I think the district judge recognized that they're very similar. We have a strong mark. And the strength of the mark is ultimately a factual question. Now, the judge even recognized we have a fairly strong mark. We think it's stronger than she thinks. Yeah, but she thought it was certainly a strong mark, yeah, not a weak mark. We have actual confusion, which is very rare. That was true of the other. There was some, well, there was some confusion, yes. I would say there's tech-savvy journalists who've been confused. Insiders, both trade show runners and the trade show attendees have been confused. Our investors have been confused. One of their investors warned them if they picked Reard & Commerce as their name, people would be confused. Customers send e-mails to us, to our domain, that are intended for them. And our own accountant at Deloitte & Touche has asked us questions about are we affiliated with Reard & Commerce. That's more than in most cases of this type don't have actual confusion. She feels that that's enough to carry it to a jury. In this Court's decision in Thain, the Court held that evidence of actual confusion was enough alone to get to a jury. Yes, Your Honor. But likelihood is sufficient under the law of our circuit, no question about it. Yeah. Well, turning to the cyber swatting. Yes, Your Honor. Thank you. Didn't Reard & Commerce demonstrate its good faith by immediately putting a stop to directing internet traffic from a Reard & L.C. domain name to the main website? Well, I think they can argue that to the jury. But there's certainly evidence that they acted in bad faith here. As soon as they learned that our name was now Reard & L.L.C., that day they registered that domain, even though they've never been in L.L.C., they've never used L.L.C. in their title. Several days later, they registered another Reard & L.L.C. That is my client's legal name, not their legal name. And they've never been a limited liability corporation. And once they did that, they directed inquiries to that domain, to their domain. So that is enough to get to a jury. They have they can make their arguments. They have arguments that they acted in good faith. Your position is that that position is their good faith. That's an argument for a jury, not a fact question. Definitely, Your Honor. And here the judge basically decided a question. She said, she looked at the record and said, well, but their general counsel said they sort of had a haphazard policy of registering these things, and basically, I credit that. And that's just not the stuff of summary judgment. There's clearly a dispute of fact on the cyber-squatting claim. If I may, Your Honor, I'd like to reserve the balance of my time. You may do so, counsel. Thank you. We'll hear from the other Reardon. Thank you. Good morning, Your Honor. My name is Richard Harris. And with me on the brief is my partner, Kevin O'Shea. O'Shea. May it please the Court, if there was ever an example, a profound example of a case that was ripe for disposition via summary judgment in the arena of trademark law, it's this case. We have marks that were found by the Court to have questionable use as to whether they were ever used as a mark. And in fact, defendant in this case, Reardon Commerce, is the party that was given senior use of the mark because they used the mark openly in a fashion to advertise for use by a consumer as of February 2005, as opposed to July of 2005. Isn't the whole case, at least the trademark part of it, turn on the question of who the relevant market is with regard to confusion? It turns in part on that, Your Honor. Please remember also that this case involves two separate summary judgment motions for the exact same areas, the Trademark Act and the Cyber-Squatting Act, brought by plaintiffs. So we've got two competing summary judgments. But does that necessarily mean that someone's got to prevail on summary judgment if they're brought in? It's not automatic, but it's certainly a pretty good indicator that the facts are not at issue. There are no material facts. Well, it doesn't mean anything. It means that whoever's going to prevail has to show that the other party had no facts. That's true. It doesn't mean anything to me. Well, it suggests that at one point in time, both parties thought there's no issues of material facts. Well, you still have to prove that there are no material facts, don't you? Absolutely. That's the same thing you have to prove that they never moved for summary judgment. That's correct. And in response to the first question, there is a requirement that the trademark end of the case is going to turn on whether or not there was a trademark and whether or not there was a likelihood of confusion under Sleekcraft. And in this particular case, there's eight or nine elements under Sleekcraft. And we looked at the similarity, remembering, of course, that in February of 2005, it's the defendant that's the senior holder. When you go through each of the issues, there's no proximity at all. There's no ---- Well, what ---- but let's get to the consumer part. What do you think her position that, you know, they didn't ---- that you don't actually have to be a buyer to be a consumer, and that under the ---- the ---- some of the opinions of the Ninth Circuit, non-consumers, people that never bought anything, can be considered consumers for trademark purposes, if there are potential, and in the market of your ---- where you're operating. Your Honor, we submit to the Court that you have to be, in some way or fashion, either part of the consuming public or associated with the consuming public. What we've seen here that's being offered up by plaintiff is ---- excuse me ---- is journalists who write articles, vendors, landlords, things of that nature, who sell or describe about or to plaintiff, have nothing to do whatsoever with receiving anything from the plaintiff. That's not part of the consuming public. Well, the ---- If ---- If Pellin's position is that they're in the same ---- that you're catering to the same clientele, and even though that some of those people may not have consumed for them, there are potential people that could be confused. Well, that would appear to be, as I read Ninth Circuit law, the two cases right on it, that you don't have to have actually bought anything to be a consumer for trademark purposes. Your Honor, I agree wholeheartedly with you. But you can't substitute individuals who have nothing to do with goods in completely separate channels of trade. Granted, they both use the Internet, but one is directed to concierge services for buying flight tickets, and the other is for structuring new companies and developing new technology owned by the owner of the company. But there still has to be some connection to the consuming public where the goodwill aspect of a mark comes into play, and in this case it simply does not. The Court had asked plaintiff, shouldn't you be pursuing under the theory of dilution? In fact, in this case, Your Honor, they did, and they dropped that count because of the fame requirement. Right. That's what I was saying. But essentially what they're arguing is that you – there is still a goodwill component to ordinary Lanham Act trademark law, right? That's correct. And their basic argument is that you are in several different ways profiting by their goodwill, because people think you're connected with them, and they have at least some evidence that people think you're connected with them. And then I assume what they're saying is, so therefore either investors might start looking at you who wouldn't otherwise look at you, or people who buy your services might have more confidence in you than they might have otherwise because they think you're affiliated with them. Is that – assuming that the record shows that, would that make out a trademark case? I don't – in this particular case, Your Honor, number one, I don't believe the record shows it. And number two, with regard to other yet of the sleek craft elements such as sophistication, people who are working with the owner's development in this environment of new technology, new company investing $30, $40, $50 million does not for a moment believe that they're going to get their next airplane ticket and line up their next limousine service in association with that incubator company. There was no factual basis whatsoever for that. In fact, from my perspective, Your Honor, as a trademark attorney who works with the U.S. Patent and Trademark Office all the time, you establish a mark – there's a protocol for showing that you've got a mark. You bring in people who recognize the mark, who can say, who can actually give evidence. Well, there was evidence that it was used prior to even 2005. There was evidence in this – in the record. The reareded name appeared in the credits of the movie How to Make a Monster, I think, and – which was a 2001 production, and it was in DVD as well. Well, that's an after-the-fact credential, Your Honor. That's after the movie's done. It simply shows they were a contributor, and that particular item was not released until 2007. I think there's pretty good recognition that prior to July of 2005, there was no with regard to plaintiff's use of the mark. They had incubation – evidence of incubation-related transactions, such as securing a couple million dollars, funding reareded steel technologies, or whatever it's called, in – I don't know. It could have been about 2001 or thereabouts. I forget now. Yeah. There's not a doubt, Your Honor. The record shows that Mr. Perlman's – the owner's ideas – they were only his incubation company – was the recipient of investor money. And every time, without fail, every time a project went through incubation, it came released out of another mark. There was an admission during oral argument on the motions for summary judgment, both theirs and our motions. There was an admission that while all these ideas are Mr. Perlman's ideas and all these companies are Mr. Perlman's efforts to incubate and then release a company, counsel admitted at those arguments that it's feasible, theoretically, that someone in the consuming public, outside of Mr. Perlman, could approach, reared and plaintiff, appellate here, and ask to have one of their companies, one of their ideas, incubated. There was no showing that that ever occurred. There was no showing of ever – of any marketing, any advertising to that purpose. This is an internal company that merely worked with the internal company's own ideas, spun them out, and sold them. Do you disagree with the Sleekcraft facts that the appellant ticked off for us here? I agree with – I believe I heard as the Court of Appeals, too. They're the ones that the district judge actually related as well. Yes. The two – the similarity, certainly there, although Reardon was deemed a suggestive mark, not a particularly strong mark. It was in the middle. Well, middle ground. It was middle ground. But it's not a weak – she didn't make it a weak mark, either. But it was not arbitrary and – not an arbitrary or fanciful mark, either. It was right in the middle, at the point of suggestion, understood. But we not only went through the one or two that were mentioned to this Court today. We looked very carefully at what the Court did with the six other ones, with no proximity, no actual confusion, one by one by one. And there's a suggestion that the Court – and I hate to be arguing plainest case here – there was a suggestion that the Court somehow employed some mechanical lockstep analysis when, in fact, when Plaintiff submitted its analysis under Sleecraft that amounted to four and a half pages, the Court spent 12 pages going through each and every fact that Plaintiff considered, took it into account, looked at it within that Sleecraft factor, and then looked at it again as a whole. Well, it's not what a jury does. You're talking about it was what a jury does, not a judge. Well, you know, here again, Your Honor, this is a case where there are such crucial missing elements with regard to use of the mark, with regard to proximity and everything. You know, virtually anything, I guess, could go to a jury. But in this particular case, with both sides fighting that there are no material facts, the Court agreed. But it selected the facts as presented by a defendant, not Plaintiff. Your ultimate position, or I guess you have two positions. One of your positions is that this was not a mark used in commerce. It's not a mark used in commerce. Not by Plaintiff. That's correct. At least certainly not before July of 2005. And that's – that was not what the district court held. She did not get this right. That's exactly what the district court held. The district court, the first time around, in the first motion on the trademark issue, said, look, I'm not going to say whether there are any rights. She reserved it because the Court had such a compelling position on likelihood of confusion, the fact that there was none and could be none, that it addressed that and left the other one off the table somewhere. But coming back when both sides again moved for some adjustment. What about on the evidence of actual confusion? There is none. There is none? There is none. No. You do have – I should explain. Your Honor, you do have some examples where someone picked up the phone, an author who's writing an article on a company. It wasn't only people who were writing articles. It was – That's true. It was the people who were running the conference and there were lots of other people. That's not confusion. And a suggestion that the company is getting – Why is it not confusion? That's what I need to know. What it was – according to the Court, and we believe this is accurate because the Court was familiar with some other things that were done to generate the appearance of confusion. According to the Court, there were mistakes in what people type in with regard to domain names, email addresses. And it ended up that the plaintiff removed the filter from their email server so that the wrongly addressed emails to people not at that location normally bounce back, like when you send an email to the wrong place and it says, sorry, cannot be delivered. They removed that filter so they were getting anything in there with the name Reardon. Those were the showings of these purported misdirected emails, which are not misdirected. The other aspect as to any error of an author or journalist as to whether a company was affiliated – I thought – you're picking out the ones that most favor you. My understanding is there were instances in which people dealing with this conference were confused, people were asking whether they were – whether they were related to each other. I mean, there were certainly some – there would be. Why wouldn't there be? Your Honor, you picked a terrific example. That particular conference, the Web 2.0 conference, is an employment conference looking for people who work in the industry, programmers, to see if they'll work for your company. It's not really an industry conference. It's an employment conference. And in this particular case, this Court had before it the facts – You're standing on it. Go ahead. Well, in this particular case, the Court had before it facts showing that there was an actual attempt to create the illusion of confusion.  a bigger and bigger booth to get it closer to defendants' booth, and then circulated a survey, which sort of blew up in their face, as to, gee, are you confused? Well, they're right across the aisle from each other at that point after they moved their booth three times, and they started a survey, which survey got closed down, by the way, by the operators of the – of the show. Counsel, before your time expires, I want to get to the cybersquatting issue. Sure, Your Honor. And I must say, I have some trouble with the use of the Reardon LLC by your client. And why isn't that an indicia of bad faith? In the context of the circumstances here, Your Honor, I can explain exactly why. Immediately prior, for a year and a half, two years, two and a half years prior to the that had registered just about every permutation it could think of to make sure that it did, like the Harrods case provides, secures a portfolio of domain names in case people make mistakes. They addressed Inc., they addressed Corp., they addressed Company, they addressed every different version, until one day a dispute is arising now between the trademarks, and they discover that they forgot, that they didn't register LLC. So they went ahead and registered LLC. And ever since that date, they registered 48 more, four dozen more since that point in time, to make sure that they've got a portfolio with every permutation. Okay. This is a perfectly appropriate argument to a jury, but why isn't there a question of fact here in light of what you've heard your opposing counsel say? Your Honor, it comes down to, under the Gopetz case, as to what the state of mind was at the time of the registration, not a half year later, not a year and a half, two years later. There is no one That's for a jury to determine what the state of mind was. As a matter of fact, the general counsel said that they did that because they were in a trademark dispute. They registered because they were in a dispute. And he's bolstering his portfolio, just like everybody does in a trademark dispute. That's not for purposes of illicitly marketing. Well, yeah, but this is a question of fact, whether you obtain all these because you wanted to have you were in this you wanted ammunition for a trademark dispute that your argument can go to a jury and say, no, this is what they usually do and it's regular business. But their position is you did this in order to steal their name. Yeah, but at the same time, Your Honor, you're looking at, number one, what evidence there is coming from plaintiff. You're also looking at other gestures of good faith with regard to the fact that without even being asked for it at a mediation, they parked it as simply as a gesture of good faith and then got accused of marketing, of transacting marketing in the area of this registration. Thank you very much, counsel. Your time has expired. Thank you, Your Honor. We'll hear from the other side. Ms. Maynard, you have some reserve time. Thank you, Your Honor. First, it simply isn't true that the incubation services are not sold. The record is at least there's a clear dispute of fact on that. And on page 612 of the excerpts of record, Reardon in connection, paragraph 18, Reardon in connection with the Reardon name provides management, infrastructure, and funding so that a complex development projects can be released as successful ventures. In the case of incubated company Ice Blink, which the record also shows was not Mr. Perlman's idea, someone else's idea, it's very clear. All of these services were provided and are administered by the Reardon incubator and in return, Ice Blink Studios paid Reardon an ongoing fee. So is that the problem I'm having with this case is understanding who the relevant consuming public is, right? So is the relevant consuming public people who might have ideas that they want incubated? That's definitely part of the consuming public. Okay. Is there any evidence that any of those people are confused? Well, there's evidence that investors were confused. And those are the people that. What is the evidence that the investors are confused? Can you tell me where you mentioned one particular person? Can you tell me where the record, where that is in the record? Yes, Your Honor. Mr. McGarvey or something like that? One of our investors was actually confused. Excerpts of record 636, paragraph 77. Excerpts of record 907 to 10. There's actually also in a site in our brief where one of their investors, and again, we're all, both of these companies are operating in the same Silicon Valley market, but one of their investors said, if you choose this name, there's going to be confusion. And I don't have the site at my fingertips, but that's also in our brief. The evidence of record also shows that, and Mr. Perlman's declaration states that he's consistently used the name Rearden in business since 2001. The Rearden.com website has been since 2001. That's at ER 610, ER 609, 610. The building has been, has had the Rearden name on it, a physical building here in San Francisco since 2000. And since 1999, the Rearden companies have been featured in hundreds of published articles in major businesses, technology, science, entertainment, and general audience publications. And there's an entire list of those, including lots of copies of those articles in the ER. So there's, at a minimum, this is just, these are just the factual disputes that we're arguing here today that we should be entitled to argue to a jury. We would request that you reverse. Thank you very much, counsel. The case just argued will be submitted for decision, and the court will take a ten minute recess.
judges: O'scannlain, Cowen, Berzon